FILED
2021 Oct-20  AM 10:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

|  |  |
|---|---|
| **HOPE M. CARR, et al.,** | ) |
|  | ) |
| **Plaintiffs,** | ) |
|  | ) Civil Action Number |
| **vs.** | ) **5:15-cv-00356-AKK** |
|  | ) |
| **AUTOZONER, LLC; AND** | ) |
| **AUTOZONE STORES, INC.,** | ) |
|  | ) |
| **Defendants.** | ) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs, who work or worked as store managers for AutoZone stores across the country, allege that AutoZoner, LLC and AutoZone Stores, Inc. (collectively "AutoZone") violated the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, by improperly classifying them as exempt employees under the Act. Doc. 1. After a period of discovery, the court conditionally certified this action as a collective action under 29 U.S.C. § 216(b). Doc. 67. AutoZone has now moved to decertify this action, doc. 333, arguing that the class members are not similarly situated because their duties as store managers and discretion over managerial tasks differ from store to store and district to district, docs. 341; 498. For the reasons discussed below, and especially because the record reveals differences with respect to the plaintiffs'

performance of and discretion over their managerial duties and their authority for hiring and promotions, AutoZone's motion is due to be granted.

## I.

The FLSA requires employers to pay their employees time and a half for hours worked in excess of forty hours per week, unless, relevant to this case, the employee is "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. §§ 207(a), 213(a)(1).  The FLSA authorizes collective actions against an employer for unpaid overtime compensation "by any one or more employees for and on behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).  Thus, "[t]o maintain a collective action under the FLSA, plaintiffs must demonstrate that they are 'similarly situated.'" *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007) (quotation in original omitted).

The Eleventh Circuit suggests a two-stage procedure for district courts to effectively manage FLSA collective actions.  *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1260 (11th Cir. 2008).  First, at the conditional certification stage, the court determines whether to authorize notice of the action to other employees or former employees who may elect to opt-in to the suit.[1]  *See id.*  "The standard for determining similarity, at this initial stage, 'is not particularly

---

[1] The FLSA requires that would-be plaintiffs affirmatively opt-in to the suit.  29 U.S.C. § 216(b).

stringent.'" *Id.* (quoting *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1214 (11th Cir. 2001)).   An employer's motion to decertify triggers the second stage, during which the court determines whether the named plaintiffs and the opt-ins are in fact similarly situated.  *Hipp*, 252 F.3d at 1218.   The plaintiffs bear a heavier burden to show similarity at this stage, and they "must rely on more than just 'allegations and affidavits.'"  *Morgan*, 551 F.3d at 1261 (quoting *Anderson*, 488 F.3d at 953).   At all times, the certification determination "remains soundly within the discretion of the district court."  *Hipp*, 252 F.3d at 1219.

## II.

AutoZone operates over 6,000 stores across the United States, Puerto Rico, Mexico, and Brazil that are organized into divisions, regions, and districts.  Doc. 335-13 at 2.  Each district includes seven to fifteen stores overseen by a district manager who is responsible for the overall economic performance of the district.  *Id.* at 3.  AutoZone stores are classified as retail, commercial, or hub stores, and the stores vary widely in size, sales volume, and number of employees.  *Id.* at 3-5.  Retail stores generally employ between five and twenty hourly employees in various positions, including assistant store manager, parts sales manager, and full- and part-time sales positions.[2]  *Id.* at 4.  In addition to those positions, the commercial stores,

---

[2] AutoZone refers to assistant store managers and parts sales managers as "Gray Shirts," and to employees in sales positions as "Red Shirts."  Doc. 335-13 at 4.

which employ between three and forty hourly employees, also employ hourly employees as commercial sales managers, commercial specialists, and drivers. *Id.* Finally, the hub stores act as distribution centers for surrounding AutoZone retail and commercial stores, and employ additional hourly employees as hub coordinators, hub specialists, hub drivers, and hub pickers. *Id.* at 5. The hub stores are generally larger than retail and commercial stores, and employ between fifteen and more than one hundred employees. *Id.*

Despite those differences between store categories and stores, each store operates under the direction of a single store manager who reports directly to a district manager. *Id.* at 3, 6. The store manager is the highest-level and highest-paid employee at each store, and the hourly employees report directly to him or her. *Id.* at 6; *see also* docs. 336-13 at 6; 336-19 at 5; 336-22 at 10; 336-44 at 6. With the exception of managers in California and Puerto Rico, AutoZone classifies all store managers as exempt executive employees. Docs. 335-38 at 3; 494-1 at 14-15. As such, store managers earn a salary, and AutoZone does not pay them overtime for any hours they work over forty hours per week even though it expects store manager to work at least fifty hours each week. Docs. 335-8 at 2; 335-13 at 7; 494-1 at 23; 494-7 at 10; 494-13 at 22. Store managers are the only employees at the store level who are paid on a salary basis, and they are the only store-level employees eligible

for an incentive bonus based upon the store's financial performance.  Doc. 335-13 at 7.

The plaintiffs claim they work between fifty-five and sixty-five hours per week and spend eighty to ninety-five percent of their time performing non-managerial tasks that hourly employees also perform.  *See, e.g.,* docs. 336-2 at 29; 494-23 at 4; 494-26 at 2-4; 494-115 at 3-4; 494-124 at 3-4; 494-126 at 3-4; 494-127 at 3-4; 494-128 at 3-4; 494-129 at 3-4; 494-130 at 3-4; 494-131 at 2-3; *see also* docs. 494-21 – 494-136.  The plaintiffs also contend that, in light of AutoZone's policies, sales and customer service are their most important job duties.  *See* docs. 494-23 at 2-5; 494-26 at 10; *see also* docs. 494-21 – 494-136.  Based in part on these contentions, the plaintiffs assert that AutoZone incorrectly classified them as exempt management employees and that they should receive overtime pay under the FLSA. Docs. 1; 493.

## III.

Consistent with the Circuit's two-step approach,[3] the court conditionally certified a class of store managers, doc. 67, and the plaintiffs gave notice to potential class members, *see* doc. 73.  Subsequently, more than 1,500 current and former AutoZone store managers opted into this suit.  *See* docs. 74-77.  Thereafter, the parties conducted discovery that, in part, limited depositions to a maximum of 50

---

[3] *Morgan*, 551 F.3d at 1260.

per side.  *See* doc. 80 at 3.  AutoZone is now moving to decertify, arguing that the plaintiffs have not shown that their employment settings and job duties are similar with respect to the factors relevant to its executive exemption defense—whether the plaintiffs' primary duty was management, whether the plaintiffs regularly directed the work of two or more other employees, and whether the plaintiffs had authority to hire or fire or their recommendations were given particular weight.  Doc. 341 at 13-30.  AutoZone further contends that differences among the plaintiffs will require it to present an individualized defense for each plaintiff, which would result in numerous mini-trials, and, therefore, fairness and procedural concerns weigh in favor of decertification.  *Id.* at 25-33.  The plaintiffs counter that the evidence reveals that the class members work in similar settings with similar oversight, and their work is governed by the same mandatory corporate policies.  Doc. 493.

The plaintiffs bear the burden of proving the named plaintiffs and opt-in class members are similarly situated and that the action should proceed as a collective action.  *See Anderson*, 488 F.3d at 952.  The FLSA contains no guidance on the level of similarity required, and the Eleventh Circuit has not precisely defined the term "similarly situated."  *Morgan*, 551 F.3d at 1259.  The Circuit has admonished that "under 216(b), courts determine whether employees are similarly situated—not whether their positions are identical."  *Id.* (citing *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996)).  Nevertheless, "the similarities necessary to maintain

a collective action under § 216(b) must extend 'beyond the mere facts of job duties and pay provisions.'" *Anderson*, 488 F.3d at 953 (quoting *White v. Osmose, Inc.*, 204 F. Supp. 2d 1309, 1314 (M.D. Ala. 2002)) (internal citation omitted). The similarities must also "encompass the defenses to some extent," and the court "must consider whether the defenses that apply to the opt-in plaintiffs' claims are similar to one another or whether they vary significantly." *Morgan*, 551 F.3d at 1262 (citing *Anderson*, 488 F.3d at 953-54). And, logically, "as more legally significant differences appear amongst the opt-ins, the less likely it is that the group of employees is similarly situated." *Id*. at 1261 (citing *Anderson*, 488 F.3d at 953).

To determine whether the plaintiffs are similarly situated, the court considers: "'(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants that appear to be individual to each plaintiff; and (3) fairness and procedural considerations.'" *Id.* (alteration in original omitted), This entails ascertaining whether the court "can coherently manage the class in a manner that will not prejudice any party." *Briggins v. Elwood TRI, Inc.*, 882 F. Supp. 2d 1256, 1263 (N.D. Ala. 2012) (internal citation omitted). These three factors are not mutually exclusive, and the court must consider the individual class members' factual and employment settings in light of the employer's executive

exemption defense.[4]  *See Knott v. Dollar Tree Stores, Inc.*, 897 F. Supp. 2d 1230, 1234-35 (N.D. Ala. 2012).  Thus, to decide whether maintaining a collective action is appropriate, the court must consider the similarity in the plaintiffs' employment settings with respect to (1) whether their primary duty is management, (2) whether they regularly direct the work of other employees, and (3) whether they have authority to hire or fire or whether AutoZone gives particular weight to their recommendations.  The court turns to these issues now, beginning with whether the plaintiffs' primary duty is management.

## A.

According to AutoZone, differences exist in how the plaintiffs perform their duties that preclude this court from finding that the plaintiffs are similarly situated on the "primary duty is management" prong.  Allegedly, "no single decision, policy, or plan" AutoZone implemented requires a store manager to perform non-managerial tasks as their primary duty,[5] and material differences exist in the

---

[4] An employee qualifies as an exempt executive if (1) she is compensated on a salary basis at a rate of at least $455 per week; (2) her primary duty is management; (3) she customarily and regularly directs the work of two or more other employees; and (4) she has authority to hire or fire other employees, or her suggestions and recommendations as to the hiring, firing, or promotion of other employees are given particular weight.  29 C.F.R. § 541.100(a) (2006) (effective to December 31, 2019).  Only the second, third, and fourth factors are at issue in this case.  *See* doc. 341 at 13.

[5] An employee's primary duty is "the principal, main, major or most important duty that the employee performs," and determining "an employee's primary duty must be based on all the facts in a particular case, with the major emphases on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a).  Factors the court considers when determining whether in employee's primary duty is management include "[1] the relative importance of the exempt duties as compared

managerial duties the plaintiffs actually performed and in their discretion over those duties.[6]  Doc. 341 at 9-13.  On the other hand, the plaintiffs maintain that they work in "virtually identical factual and employment settings" in part because the same, uniform policies govern operation of AutoZone's stores throughout the country and those policies mandate that customer service and sales are a store manager's primary duties.  Doc. 493 at 6, 9-28.  Indeed, Nancy Stephens, Director of Field Human Resources, testified that the same mandatory policies and procedures, including those related to scheduling, employee training, appraisals, discipline, termination, hiring, opening and closing procedures, ordering, sales, and customer service, apply to all AutoZone stores.  Doc. 494-1 at 20-22.  But, uniform corporate policies alone are not dispositive on the similarly-situated issue.  "Rather, it is necessary to review the actual job duties of [the store managers] to determine whether they are similarly

---

with other types of duties; [2] the amount of time spent performing exempt work; [3] the employee's relative freedom from direct supervision; and [4] the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."  29 C.F.R. § 541.700(a).

[6] The relevant regulations provide that managerial duties "include[], but [are] not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures."  29 C.F.R. § 541.102.

situated and whether the exemption defense can be collectively litigated." *Morgan*, 551 F.3d at 1264, n.46.[7]  In that regard, and as discussed below, the record reveals differences in the plaintiffs' performance of and discretion over their managerial duties, and whether they perform their managerial duties concurrently with sales and customer service tasks.

## 1.

AutoZone maintains mandatory and standardized policies regarding customer service, *see* docs. 494-1 at 20-21; 494-2; 494-8 at 37, which the plaintiffs maintain undermine AutoZone's contention that the plaintiffs' primary duty is management. According to the plaintiffs, these policies, including Drop-Stop/30/30,[8] GOTTChA,[9] WITTDTJR,[10] Go the Extra Mile, Jackson 5, and WOW! Customer Service, mandate that a store manager's primary duties are customer service and sales and ensure that all store managers perform those duties in the same way.  Doc. 493 at 6, 12-14.  Indeed, some AutoZone witnesses testified that customer service and sales

---

[7] Likewise, AutoZone's blanket classification decision for store managers outside of California and Puerto Rico does not on its own render the plaintiffs similarly situated.  *See Morgan*, 551 F.3d at 1264, n.46; *Knott*, 897 F. Supp. 2d 1239-40.

[8] Drop-stop/30/30 refers to AutoZone's policy that any employee who is at the front of the store is to drop or stop what they are doing to greet a customer before the customer gets thirty feet into the store, or has been in the store for thirty seconds.  *See* doc. 494-2 at 3.

[9] GOTTChA stands for "go out to the customer's automobile."  Doc. 494-2 at 3.

[10] WITTDTJR stands for "whatever it takes to do the job right."  Doc. 494-1 at 76.

are employees' most important job duties.  Docs. 494-1 at 76; 494-4 at 17, 45-46; 494-8 at 36; 494-14 at 19-20; 494-16 at 10-11.  The plaintiffs also submitted numerous declarations uniformly stating that customer service and sales are their most important job duties and that, like the non-managerial employees, they spent the vast majority of their time performing those duties instead of management tasks.  *See* docs. 494-21 – 494-136.  But, the time spent performing non-managerial tasks is not dispositive and is just one factor courts consider when determining primary duty.  29 C.F.R. § 541.700.  In addition, "[c]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of [the exemption] are otherwise met."  *Id.* at § 541.106(a); *see also Morgan*, 551 F.3d at 1268.  Thus, the court must consider whether the plaintiffs performed management duties concurrently with their non-managerial tasks, as AutoZone contends.  *See* doc. 341 at 22.

According to the plaintiffs, AutoZone's requirement that employees focus on customer service and sales policies prevents the plaintiffs from performing managerial duties concurrently with customer service and sales duties.  Doc. 493 at 13, 26-27.  Many of the plaintiffs submitted declarations stating that, in light of AutoZone's mandatory policies, they "could not do anything else when [they were] performing customer service."  *See* docs. 494-112 at 4; 494-113 at 4; 494-114 at 4; 494-21 at 2-5; *see also* docs. 494-21 – 494-136.  While that may be the case for these

plaintiffs, several plaintiffs testified that they were always responsible for and managing their stores even when they were performing customer service and sales. Docs. 336-2 at 22-23; 336-3 at 46; 336-13 at 8; 336-14 at 39; 336-17 at 26-27; 336-18 at 28, 36-37; 336-19 at 7; 336-20 at 17; 336-23 at 30; 336-26 at 27-28; 336-24 at 23-24; 336-43 at 31.[11]  For example, a plaintiff who is a store manager in Idaho and Oregon testified that he supervises approximately thirty employees even when he is at the counter selling or performing other non-managerial tasks, and he agreed that he remained accountable for his store's performance at all times.  Doc. 336-2 at 22-23.  Likewise, a store manager in Indiana reported that she supervises approximately eight or nine employees even when she is performing non-managerial tasks, and that she can delegate tasks to those hourly employees.  Doc. 336-23 at 30.  And, a store manager in Oklahoma testified that if a customer or employee has a problem that another employee cannot resolve, he is responsible for handling those problems even when he is performing non-managerial duties.  Doc. 336-43 at 31.

This testimony establishes that at least some of the plaintiffs perform managerial or supervisory duties concurrently with customer service and sales.

---

[11] The plaintiffs correctly note that testimony that a plaintiff is always "in charge" of a store is not sufficient to establish that a plaintiff's primary duty is management.  Doc. 493 at 27.  Instead, to determine the plaintiff's primary duty, the court must "scrutinize the factors in the Secretary's regulations . . . ."  *Morgan*, 551 F.3d 1272, n.60 (citation omitted).  Still, the plaintiffs' testimony that they were in charge of their stores at all times is relevant to the question whether the plaintiffs performed managerial duties concurrently with non-managerial tasks such as sales and customer service.

Moreover, the amount of time the plaintiffs spend on non-managerial tasks does not preclude a finding that their primary duty is management. *See* 29 C.F.R. § 541.106.[12]   Thus, the plaintiffs have not shown that the amount of time the plaintiffs spend on non-managerial tasks mandates a finding that they <u>all</u> performed sales and customer service as their primary duty or that they are all similarly situated with respect to their primary duty.

## 2.

The court turns now to the evidence relating to the plaintiffs' performance of their managerial duties and discretion over those duties.   One of the plaintiffs' managerial duties is scheduling.   The plaintiffs assert that they have no discretion over this function because AutoZone maintains mandatory policies and procedures that govern scheduling.   Docs. 335-1 at 6; 494-1 at 67, 70; 494-6 at 16-17; 494-7 at 15; 494-137 at 2-59.   Those procedures include utilizing a computer program to generate a weekly schedule based on employee availability entered by a store manager or employees and a labor budget for the store that AutoZone determines at the corporate level without any input from the store manager.[13]   Docs. 336-10 at 39;

---

[12] *See* 29 C.F.R. § 541.106(b) ("An assistant manager can supervise employees and serve customers at the same time without losing the exemption.   An exempt employee can also simultaneously direct the work of other employees and stock shelves.").

[13] The labor budget reflects the collective number of hours a store's employees can be scheduled to work. *See* doc. 494-7 at 11-12; 494-8 at 13.   Under AutoZone's policies, store managers should not deviate from the labor budget provided to them.   Docs. 494-4 at 31; 494-5 at 31; 494-7 at 12; 494-13 at 26.

494-1 at 67, 70-71; 494-4 at 30-31; 494-5 at 30; 494-7 at 12-13; 494-8 at 13; 494-12 at 24; 494-13 at 24.  After a store manager checks the computer-generated schedule and adjusts it as needed within AutoZone's parameters, the schedule is only finalized after a district manager reviews, approves, and publishes it.  Docs. 336-2 at 14-15; 336-6 at 32; 336-17 at 17-18, 29; 336-18 at 17; 336-24 at 27; 336-31 at 46; 494-1 at 67, 70-71; 494-4 at 34; 494-5 at 32; 494-6 at 16-17; 494-8 at 17, 20; 494-12 at 24-25; 494-14 at 16.

Variations exist, however, in how store managers carry out their responsibility for scheduling employees.  For example, at least six plaintiffs indicated that they prepared their store's schedules, docs. 336-13 at 7; 336-17 at 17; 336-19 at 7; 336-21 at 4; 336-22 at 16; 336-43 at 19, while other plaintiffs reported that they shared the responsibility with their assistant store managers and sales managers, docs. 336-2 at 13, 26; 336-6 at 15, 32; 336-7 at 9; 336-20 at 19-20; 336-23 at 19; 336-26 at 18; 336-35 at 48; 336-44 at 13-14.  And, although one plaintiff testified that AutoZone's policies prevent him from modifying the computer-generated schedule, doc. 336-8 at 126, others testified that they made numerous changes to the schedule, or even started "from scratch," without first seeking district manager approval, docs. 336-3 at 11; 336-10 at 39; 336-17 at 17; 336-35 at 15.  In addition, while some district managers routinely changed the store schedule before approving it, docs. 336-2 at 15; 336-17 at 29; 336-18 at 17, 30; 336-20 at 20; 336-24 at 27, a plaintiff and store

manager in Florida testified that his district manager never made changes to the schedule, doc. 336-3 at 11.  Also, some plaintiffs indicated that they had authority to change the schedule during the week if necessary, *see* docs. 336-2 at 14, 26; 336-14 at 9; 336-18  at 17; 336-23 at 19; 336-26 at 18; 336-43 at 20; *see also* docs. 336-11 at 21; 336-44 at 15; 494-6 at 32; 494-12 at 25, while at least three other plaintiffs had to check with their district managers before making any changes, docs. 336-7 at 12; 336-9 at 17; 336-24 at 27.  Finally, some plaintiffs testified that even after the schedule was approved and finalized, their district managers regularly told them to send workers home or cut employees' hours during the week, which often resulted in the plaintiffs working longer hours.  *See* docs. 336-2 at 26; 336-7 at 12; 336-8 at 61; 336-10 at 15; 336-17 at 29; 336-18 at 35; 336-20 at 18; 336-21 at 22; 336-22 at 16; 336-23 at 18; 336-24 at 27; 336-31 at 45; 336-33 at 9; 336-34 at 13; 336-35 at 28; 336-44 at 15; 494-131 at 5-6; *see also* docs. 336-3 at 12; 494-4 at 31-32; 494-5 at 32-33; 494-8 at 15; 494-14 at 15; 494-16 at 28.

This evidence reveals that, although all store managers are subject to the same policies and general procedures regarding scheduling, the plaintiffs exercise differing amounts of discretion and authority with respect to scheduling employees for their stores.

**3.**

The record also reflects that the plaintiffs have differing levels of authority and responsibility for other supervisory duties, including training, evaluating employees, recommending pay raises, and disciplining employees.

a.

AutoZone maintains uniform modules to train its store managers and hourly employees, including a foundations workshop that all employees must attend on their first day.  Doc. 494-1 at 37-40, 45-47; *see also* doc. 335-1 at 7, 63-67.  These modules provide detailed training regarding store operations, including how to perform certain tasks and which days to perform them, and AutoZone designs the modules to help ensure "consistency across the company."  Docs. 494-1 at 45-47; 494-20.  According to AutoZone's training policies, district managers coordinate and schedule the foundations workshop for new employees, and store managers bear responsibility for ensuring that their employees attend the workshop.  Docs. 335-1 at 64; 494-1 at 41; *see also* docs. 336-6 at 38; 336-20 at 29; 336-25 at 11.  Nevertheless, some plaintiffs testified that they shared that responsibility with their subordinates.  Docs. 336-23 at 27-28; 336-26 at 29; 336-33 at 8.  With respect to additional training for new employees, some plaintiffs testified that they provided personalized feedback to employees about their performance, *see* docs. 336-9 at 16, 31; 336-10 at 27; 336-11 at 26-27; 336-17 at 20; 336-18 at 15-16; *see also* doc. 336-

43 at 21, and at least one plaintiff provided personalized training to new employees regarding changing car batteries and windshield wipers for customers, doc. 336-35 at 41. But, two plaintiffs testified that they did not have time to provide new employees with one-on-one coaching, docs. 336-8 at 107; 336-17 at 19, and one of those plaintiffs delegated the task to the "strong[est]" hourly employees at his store, doc. 336-17 at 19.

b.

The plaintiffs also have responsibility for monitoring hourly employees' compliance with AutoZone's policies and procedures and conducting their annual performance appraisals. Docs. 336-2 at 12; 336-6 at 37; 336-17 at 20; 336-18 at 14; 336-22 at 23; 336-23 at 22; 336-24 at 34; 336-26 at 17; 336-34 at 15. Under the relevant policy, store managers complete a written evaluation form for each employee that includes a numerical rating and then meet privately with the employee to conduct an annual appraisal. *See* doc. 494-139; 336-2 at 28; 336-18 at 34; 336-23 at 22. District managers must review and approve the evaluation forms before a store manager meets with employees to conduct the review, and district managers may make changes to the forms, including to the performance rating. Docs. 336-2 at 28; 336-8 at 67-68; 336-18 at 34; 336-23 at 22; 336-24 at 38; 336-31 at 15-16; 494-1 at 60; 494-16 at 14-15; *see also* doc. 336-22 at 23. As with other duties, the district managers' involvement varied. Some plaintiffs testified that their district

17

managers changed their evaluations of employees, including the substance of the review, *see* docs. 336-2 at 28; 336-20 at 30; 336-23 at 22-23; 336-26 at 31, but other plaintiffs testified that their district managers never changed the content of their evaluation forms, and only changed pay recommendations, docs. 336-8 at 68-69; 336-10 at 35-36; 336-43 at 25, 29.

c.

Performance-based raises for hourly employees depend upon the employees' performance ratings, which district managers must approve. *See* docs. 336-2 at 28; 336-6 at 38; 494-1 at 62-63. The rating impacts whether store employees are eligible for a raise and the potential amount of the raise. Docs. 336-8 at 68-70. Store managers also recommend the amount hourly employees should receive, subject to district managers' approval. *See* docs. 336-18 at 26; 336-20 at 10. AutoZone does not maintain a written policy regarding the weight a district manager should give to a store manager's recommendation, docs. 494-1 at 49; 494-4 at 44; 494-8 at 29; 494-16 at 34, and, as in other areas, there is variation in the practice. Some plaintiffs testified that their district managers usually or always agreed with their recommendations. Docs. 336-8 at 70; 336-19 at 5. But, another plaintiff testified that his district managers often made changes, or changed at least half of his recommendations for pay raises. *See* doc. 336-10 at 36.

d.

When issues arise with employees' job performance, AutoZone policy mandates that store managers contact their district manager to determine the appropriate corrective action. Docs. 335-2 at 17; 494-1 at 34-35; 494-4 at 25. This policy is designed to ensure consistent treatment of employees in all AutoZone stores. Doc. 494-1 at 36. Nevertheless, some store managers have discretion to address the issue at the store level by coaching or writing an informal "memo to file" before contacting their district managers about a potential disciplinary issue. *See* docs. 336-10 at 31; 336-13 at 6; 336-18 at 15; *see also* docs. 336-20 at 30; 336-21 at 22; 336-22 at 17; 494-16 at 31. Even so, store managers cannot issue a corrective action form, including written warnings, or place employees on a performance improvement plan without first receiving the approval of their district and regional managers. Docs. 335-2 at 17; 336-2 at 18; 336-3 at 17; 336-8 at 102-03; 336-21 at 19; 494-16 at 31; 494-144 at 3-5. Store managers also lack authority to discharge employees, and must obtain approval from a district manager or regional manager. Docs. 336-7 at 16; 336-9 at 28-29; 494-4 at 29-30; 494-12 at 23; 494-16 at 30-31.

The evidence reveals variation in store managers' level of authority with respect to recommending what corrective actions to issue. Some plaintiffs make recommendations to their district managers regarding discipline and corrective actions. *See* docs. 336-11 at 27; 336-14 at 26; 336-17 at 33; 336-18 at 19-20; 336-

19

23 at 21; 336-31 at 38; 336-34 at 19; 336-44 at 18.  But, several plaintiffs testified that they only provided the pertinent facts and made no recommendations about what corrective action they believed was appropriate.  Docs. 336-25 at 13; 336-26 at 22-23; 336-35 at 31; 336-43 at 24.  And, one plaintiff testified that he never made a recommendation or offered an opinion, and relied instead on his district manager to tell him the appropriate action to take and what to include in a written warning.  Doc. 336-9 at 16, 32-34.

Moreover, there is no uniformity even within the group of plaintiffs who testified that they made recommendations regarding corrective actions.  Some plaintiffs reported that their district manager usually or always followed their recommendations, *see* docs. 336-23 at 22; 336-34 at 19; 336-35 at 51; 336-44 at 18, while one plaintiff testified that his district manager followed his recommendation only about half of the time, doc. 336-18 at 18, 32.  In addition, some plaintiffs testified that their district managers often made changes to the corrective action forms before approving them.  *See* docs. 336-17 at 30; 336-18 at 19; 336-23 at 21-22; *see also* doc. 336-18 at 32.  And, at least one plaintiff added that his district manager followed his recommendations to discharge hourly employees, doc. 336-19 at 5, but one other plaintiff reported that his district manager did not approve his requests to discharge employees for bad attitude or poor customer service, doc. 336-7 at 16-17.

\*       \*       \*

To summarize, based on the plaintiffs' own testimony, material differences exist regarding their involvement with and discretion over supervisory duties relating to training, evaluating employees, recommending raises, and discipline.

### 4.

According to AutoZone, the plaintiffs exercised varying levels of discretion over their managerial tasks due to differences in the amount of oversight each store received from its district manager. Doc. 341 at 20-21. Indeed, the plaintiffs concede that differences exist on the frequency of district manager visits to their stores. *See* doc. 493 at 17. The parties agree that the frequency depends on the district's physical size or geography, the experience or skill of the store manager, the store's performance, and the district manager's personality or management style. *See* docs. 336-10 at 42-43; 336-17 at 24; 336-18 at 26; 336-19 at 7-8; 336-22 at 24; 336-24 at 48; 336-25 at 17; 336-33 at 16; 336-43 at 30; *see also* docs. 335-23 at 9-10; 335-28 at 4. Many plaintiffs testified that their district manager visited their store approximately once a week or less. Docs. 336-3 at 10; 336-10 at 43; 336-14 at 10-11; 336-18 at 26; 336-19 at 7; 336-21 at 17; 336-22 at 24; 336-23 at 29; 336-25 at 16; 336-26 at 25; 336-31 at 25; 336-33 at 16; 336-34 at 22; 336-35 at 12; 336-43 at

30; 336-44 at 23; *see also* doc. 335-36 at 5; 494-16 at 6.[14]   But, for other plaintiffs, their district manager visited the store multiple times each week, docs. 336-7 at 17; 336-9 at 13; 336-17 at 24; 336-20 at 17, and one plaintiff testified that he had daily visits from his district manager, doc. 336-6 at 39.

Regardless of the visitation schedule, the plaintiffs assert that district managers still controlled essentially all store operations and that they had regular and constant contact from their district managers.  Doc. 493 at 17-18; *see also* docs. 494-21 – 494-136.   For example, the majority of plaintiffs testified or declared that their district managers called or texted them multiple times a day about store operations.  Docs. 336-6 at 39; 336-7 at 17; 336-10 at 43; 336-18 at 35; 336-20 at 17-18; 336-33 at 16; 336-44 at 23; 494-124 at 6; 494-127 at 5; 494-129 at 6; 494-130 at 6.   Others testified that they talked with their district managers only about once or twice a week.  Doc. 336-3 at 10; 336-10 at 43; 336-19 at 7; 336-25 at 16; *see also* docs. 335-36 at 5; 494-6 at 19.   And, as one would expect based on the varying amount of a district manager's contact and involvement in store operations, some store managers reported that they felt "micromanaged," *see* docs. 336-8 at 103-04; 336-10 at 43; 336-11 at 13, while others felt more empowered and accountable for their store's operation, *see* docs. 335-5 at 2; 335-14 at 12; 335-21 at 5; 335-36 at

---

[14] A former store manager in Illinois and a store manager in Kansas testified that their district managers visited their stores only about four times a year.  Docs. 336-25 at 16; 336-44 at 23.

2-4; 336-2 at 13; 336-17 at 24-25.  Finally, in light of the variation in different district managers' supervision and involvement in store operations, some plaintiffs concede that one store manager generally would not have personal knowledge of the level of supervision other store managers received from other district managers, or how involved district managers were in the operations of other stores.  *See* docs. 335-5 at 2; 336-6 at 26, 29, 39; 336-17 at 23; 336-22 at 23-24.

\*　　\*　　\*

To close, based on this record, the plaintiffs' duties and discretion over their performance of managerial duties can vary significantly from store-to-store and district-to-district.  Thus, this matter is distinguishable from *Morgan*, where the Circuit found that Family Dollar only introduced "scant evidence" to support its arguments that the duties of its store managers varied significantly depending on store size, sales volume, and district.  *See* 551 F.3d at 1263.  And, the testimony reveals material distinctions in the plaintiffs' employment settings with respect to their performance of and discretion over their managerial duties and whether they performed managerial duties concurrently with non-managerial tasks.  Consequently, differences may exist between the plaintiffs with respect to whether their primary duty is management that preclude a finding that they are similarly situated.

**B.**

The court turns next to AutoZone's contention that the plaintiffs are not similarly situated as to whether they regularly directed the work of two or more employees. Doc. 341 at 22. According to the plaintiffs, the district managers' oversight of the store schedule and AutoZone's scheduling policies uniformly limit their ability to direct the work of or delegate tasks to hourly employees. Doc. 493 at 22-23. The record shows that the schedule generated by AutoZone's scheduling program identifies daily tasks for the store to perform, denotes the time allocated to each task, and names the employee responsible for each task.[15] Docs. 494-1 at 71; 494-4 at 31, 34; 494-7 at 13; 494-23 at 6. In addition, AutoZone sends all stores a weekly Management Action Plan that provides tasks that the stores must complete during the week, doc. 494-1 at 76-77, and some district managers send weekly task lists to their store managers as well, *see* doc. 494-16 at 16, 18. Moreover, AutoZone's policies generally forbid store managers from assigning certain tasks to hourly employees on weekends which are dedicated to customer service. Docs. 494-1 at 46; 494-23 at 6-7; 336-2 at 26; 336-31 at 23.

In spite of those general similarities and limitations, variations exist in how the plaintiffs delegate and assign tasks to employees. Some plaintiffs had discretion

---

[15] AutoZone determined how long it should take employees to perform each task based on an analysis involving a relatively small number of stores. *See* doc. 494-7 at 24-25.

to delegate tasks to employees and routinely did so, including completing planograms[16] and inventory.  *See* docs. 336-2 at 29; 336-6 at 40; 336-14 at 11; 336-17 at 28-29; 336-18 at 15-16, 23-24; 336-20 at 13-14 ; 336-22 at 28; 336-26 at 17, 20; 336-31 at 25; 336-33 at 10; 336-34 at 17; 336-35 at 23; 336-43 at 21; 336-44 at 16; *see also* docs. 336-9 at 31; 336-35 at 50.  But, other plaintiffs testified that they could not delegate inventory or other merchandising tasks because they had to perform those tasks themselves.  Docs. 336-8 at 128; 336-10 at 28; 336-19 at 7.  One plaintiff testified that he did not delegate any tasks because employees "just get it done."  Doc. 336-43 at 23.  In addition, some plaintiffs reported that they shared responsibility for delegating tasks with "Gray Shirts," or that they delegated the assignment of tasks to those hourly employees.  Docs. 336-2 at 13, 25; 336-17 at 28; 336-18 at 30, 36; 336-22 at 22; 336-23 at 16-17; 336-33 at 10; 336-44 at 12-13; *see also* docs. 336-6 at 9, 40; 336-7 at 8; 336-26 at 32.  Based on this testimony, notwithstanding the corporate policies or practices the plaintiffs reference, differences exist between plaintiffs' ability to direct the work of two or more employees that preclude the court from finding that they are similarly situated with respect to this element of the executive exemption defense.

---

[16] Planogram refers to how an area of shelving in a store should look.  Doc. 336-14 at 11.

**C.**

AutoZone also contends that differences exist in the plaintiffs' authority to hire or fire employees or whether their recommendations regarding hiring, firing, and promotions are given particular weight.  Doc. 341 at 23-24.  The plaintiffs disagree and maintain that they all have little discretion in hiring and promotions and are subject to AutoZone's uniform policies and practices.  *See* doc. 493 at 18-20. The record belies the plaintiffs' contentions.

1.

There is no dispute that store managers must abide by AutoZone's hiring policies.  Docs. 494-1 at 51-52; 494-4 at 37.  Under those policies, candidates for open positions submit applications on AutoZone's eHire system, which prescreens the applicants.  Docs. 494-1 at 53; 494-138 at 3-4.  Then, store managers review the prescreened applications, select individuals to interview, conduct interviews, and determine which candidates should receive further consideration by a district manager, or who they recommend for hiring.  Docs. 336-10 at 20; 336-14 at 7; 336-23 at 25; 494-138 at 4-5.  Next, a district manager must approve the store manager's recommendation, and it is only then that the store manager can extend an offer to a candidate.  Docs. 336-2 at 27; 494-1 at 52, 54-55; 494-4 at 43-44; 494-5 at 22; 494-8 at 29; 494-138 at 5.  Relatedly, store managers must first recommend a proposed pay rate, and district managers must approve the rate of pay for a newly-hired

employee.  Docs. 494-1 at 48, 55; 494-4 at 45; 494-5 at 22; 494-8 at 29; 494-14 at 18-19; 494-16 at 36.  Once a district manager approves a candidate to hire and the rate of pay, the store manager would then extend an employment offer to the candidate.  Docs. 336-26 at 24.

As with other policies in this case, variations exist in the plaintiffs' participation in the hiring process and in the weight the plaintiffs' recommendations receive.[17]  For example, some plaintiffs had a role in making recommendations about staffing needs to initiate the hiring process or in recruiting applicants, *see* docs. 336-7 at 14; 336-10 at 28; 336-22 at 20; 336-24 at 30; 336-43 at 25-26; 336-44 at 19, while at least one plaintiff testified he did not monitor staffing levels or have any involvement in recruiting, doc. 336-8 at 126-27.  Most, if not all, plaintiffs have responsibility for interviewing applicants.  *See* docs. 336-2 at 15; 336-10 at 28; 494-14 at 17.[18]  And while store managers must follow an interview guide, or script, that AutoZone provides, *see* docs. 336-8 at 128; 494-1 at 57-58; 494-4 at 42-43, a few

---

[17] Factors the court considers when determining whether an employee's recommendations are given particular weight include:  "the frequency with which suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon."  29 C.F.R. § 541.105.  And, the employee's "recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision . . . ."  *Id.*

[18] Not all store managers are certified hiring managers, and only certified hiring managers can participate in the hiring process and conduct interviews.  Docs. 336-10 at 21; 494-4 at 37; 494-14 at 17.

plaintiffs indicated that they had discretion to vary from the script during interviews, *see* docs. 336-10 at 20-21; 336-43 at 27.  In addition, at least one plaintiff testified that he only interviewed candidates selected by his district manager, doc. 336-6 at 35, while several other plaintiffs indicated they had discretion to interview and disqualify candidates before involving their district managers in the process, *see* docs. 336-43 at 26; 336-44 at 20.  After a store manager interviews candidates and makes recommendations, many district managers conduct second interviews for "Gray Shirts," *see* docs. 336-8 at 127; 494-4 at 44; 494-5 at 22; 494-8 at 28; 494-16 at 33, and some plaintiffs testified that their district managers conducted second interviews for all positions, docs. 336-7 at 14; 336-10 at 22; 336-25 at 11; 336-26 at 23; 336-34 at 20; *see also* docs. 336-20 at 15; 336-23 at 26.

There are no set policies related to the weight that district managers should give to hiring recommendations, docs. 494-1 at 49; 494-4 at 44; 494-8 at 29, and the record reveals differences in the plaintiffs' authority and the weight district managers gave to their recommendations.  For example, a former store manager in Alabama testified that his district manager conducted all the hiring for that manager's store and selected candidates to interview, and that his district manager never approved his hiring recommendations.  Doc. 336-6 at 35-36.[19]  At the other

---

[19] Other plaintiffs echoed similar sentiments—one plaintiff testified that he never made recommendations to his district manager regarding who to hire, other than to express an opinion that someone was an outstanding candidate, doc. 336-35 at 11, and another plaintiff reported that

extreme, a store manager in Virginia decided which candidates to interview and made the hiring decisions for his store.  Doc. 336-19 at 5.  Similarly, a store manager in Wyoming and Montana testified that she had discretion to hire "Red Shirts" for her store, and that her district manager made the final decision for "Gray Shirts."  Doc. 336-17 at 20-21.  Other plaintiffs testified that their district managers agreed with their hiring recommendations only about half of the time, docs. 336-8 at 53; 336-11 at 33; 336-20 at 15; 336-34 at 21, while several plaintiffs testified that their district managers approved their hiring recommendations most of the time and hired a majority of the candidates they selected, docs. 336-10 at 23; 336-14 at 8; 336-22 at 21; 336-31 at 15; *see also* docs. 336-23 at 26; 336-26 at 7, 24; 336-35 at 44.  In addition, at least two plaintiffs testified that their district managers always approved their recommendations regarding candidates for sales positions or "Red Shirts."  Docs. 336-18 at 21; 336-31 at 42.

This testimony shows material differences in the plaintiffs' role in hiring and the weight district managers give the plaintiffs' recommendations.  As such, the plaintiffs have failed to show that they are similarly situated as to hiring authority.

---

his district manager rarely considered his recommendations regarding hiring and rarely hired the candidates he recommended, doc. 336-7 at 14.

2.

Variations also exist in the plaintiffs' authority to set pay rates. Some plaintiffs reported that their district manager set the pay level for new employees without their input. *See* docs. 336-2 at 27; 336-6 at 37; 336-22 at 21; 336-33 at 14; 336-43 at 27-28; *see also* doc. 336-11 at 33. Others testified that their district managers considered their pay recommendations for new employees, docs. 336-17 at 20; 336-18 at 23; 336-23 at 26-27; 336-26 at 24; 336-44 at 30, with some of those plaintiffs adding that their district managers usually approved their recommendations for sales employees, docs. 336-22 at 21; 336-44 at 30. In addition, several plaintiffs indicated that their district managers gave them some discretion to set a new hire's pay rate within the applicable range. *See* docs. 336-9 at 22; 336-10 at 24; 336-21 at 7. In other words, as to the setting of pay, the plaintiffs have also failed to show they are similarly situated.

3.

Differences also exist in the plaintiffs' ability to recommend store employees for promotions. Generally, store managers can make recommendations, subject to the district managers' approval. Docs. 335-1 at 25; 336-2 at 25; 336-10 at 44; 336-18 at 26; 494-1 at 49-50. However, the plaintiffs again report differing levels of involvement in promotion decisions: At least four plaintiffs worked with their district managers to select employees for promotion, or frequently recommended

30

employees for promotion, docs. 336-2 at 11; 336-3 at 10; 336-19 at 5; 336-33 at 11-12; at least four other plaintiffs rarely recommended employees for promotion, *see* docs. 336-9 at 21; 336-17 at 15; 336-25 at 15; 336-31 at 12; and at least one plaintiff never made a recommendation, doc. 336-7 at 16.  Likewise, variations exist in the weight district managers gave to the promotion recommendations.  At least three plaintiffs indicated that their district managers usually followed their recommendations, docs. 336-19 at 5; 336-26 at 29; 336-44 at 12, while another plaintiff testified that his district manager followed his recommendations about half of the time, doc. 336-11 at 19.  On the other hand, one plaintiff indicated that his district manager frequently disregarded his recommendations, doc. 336-33 at 12, and two other plaintiffs testified that their district manager never approved the few employees they recommended for promotions, *see* doc. 336-9 at 21; 336-20 at 24.

*     *     *

Taken together, the plaintiffs' testimony reveals that they did not all have the same role in or exercise the same amount of discretion over hiring, pay rates, and promotions, and that their district managers gave the plaintiffs' recommendations on these issues differing amounts of weight.  Thus, the plaintiffs are not similarly situated with respect to their authority to hire or promote, or with whether AutoZone gives their recommendations particular weight.

### D.

The plaintiffs' testimony shows substantial variations in the plaintiffs' actual performance of their job duties and their discretion over managerial tasks that raise fairness and procedural concerns about maintaining this case as a collective action. To prove it properly classified the plaintiffs as exempt, AutoZone would have to question each opt-in plaintiff at trial about her day-to-day duties, her district manager's involvement in her store, and her discretion, if any, over managerial duties. "That exercise is tantamount to conducting multiple individual trials on the merits and is the antithesis of a collective action." *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 586 (E.D. La. 2008) (citation omitted). In other words, AutoZone's executive exemption defense appears to be individual to each plaintiff.

And, based on the differences in their testimony, the plaintiffs are unable to fairly present their claims at trial using common testimony from a subset of plaintiffs regarding their daily responsibilities and duties, or the weight given to their recommendations for hiring, firing, and promotions. To make a factual determination on the appropriateness of the exempt classification based on the representative testimony of plaintiffs with less authority and discretion than other plaintiffs would raise procedural and fairness concerns for AutoZone. Likewise, making that same determination based on the representative testimony of plaintiffs with more authority and discretion than other plaintiffs would raise similar

procedural and fairness concerns for other opt-in plaintiffs.  Thus, although a collective action could reduce the burden on the plaintiffs by allowing them to adjudicate their claims in this court instead of in multiple courts, maintaining a collective action here would prove prejudicial or result in many individual mini-trials, rendering a potential trial unmanageable.  *See Briggins*, 882 F. Supp. 2d at 1278-80 (decertifying a collective action based in part on fairness and procedural concerns).  As a result, the court finds that fairness and procedural considerations weigh in favor of decertifying this action.

## IV.

In conclusion, because the plaintiffs' deposition testimony reveals differences in their daily responsibilities, discretion over managerial tasks, authority for hiring, and the weight district managers gave the plaintiffs' recommendations on hiring, pay rates, and promotions, the plaintiffs have not met their burden to establish they are similarly situated.  Consequently, AutoZone's motion, doc. 333, is due to be granted, and the court will decertify this matter as a collective action.

However, because some of the opt-in plaintiffs' claims that were timely when those plaintiffs opted-in to this action may now be time-barred, the court will give the parties time to confer about a tolling agreement to preserve the claims of the opt-in plaintiffs remaining in this action before it issues an order decertifying the class and dismissing the claims of the opt-in plaintiffs without prejudice.  The court

**ORDERS** the parties to submit a status report regarding their progress on a tolling

agreement by email to the undersigned chambers on or before **November 19, 2021**,

and this matter is **SET** for a telephone status conference on **November 22, 2021** at

**12:15pm**.

     **DONE** the 20th day of October, 2021.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE
